# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4809 CONSOLIDATED 01 C 4839 | **DATE** | 3/26/2002 |
| **CASE TITLE** | ABBOTT LABORATORIES, et al vs. BAXTER PHARMACEUTICAL PRODUCTS, INC | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]  Abbott's motion to confirm the Arbitration Award [8-1] is hereby granted. Baxter's motion to vacate [16-1] is denied with prejudice. Both cases are terminated and all other pending motions are terminated as moot. This is a final and appealable order. Enter Memorandum Opinion and Order. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 27 2002 | |
| | Docketing to mail notices. | | date docketed | 6 |
| | Mail AO 450 form. | | CM | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 3/26/2002 | |
| | | | date mailed notice | |
| CG | courtroom deputy's initials | | CG | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

MAR 2 7 2002

| | | |
|---|---|---|
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Petitioner, | ) | No. 01 C 4809 |
| | ) | No. 01 C 4839 |
| | ) | Judge Ronald A. Guzman |
| v. | ) | |
| | ) | |
| BAXTER INTERNATIONAL INC., | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BAXTER INTERNATIONAL, INC., | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES | ) | |
| | ) | |
| Respondent. | ) | |

Pending are the parties cross motions for summary judgment pursuant to Fed. R. Civ. P. 56.

For the reasons set forth below Petitioner Abbott Laboratories' motion is granted and Respondent

Baxter International, Inc.'s motion is denied. Abbott's motion to strike the affidavits submitted by

Baxter is granted. The final award dated June 15, 2001 and issued on June 22, 2001 is hereby

confirmed.

## BACKGROUND FACTS

Sevoflurane is a fluorine-based inhalation anaesthetic first developed by Baxter International,

Inc. ("Baxter") scientists in the mid-1960s and since then has been subject to a product patent and

various process patents in the United States and elsewhere. Baxter succeeded in developing an

1

efficient process for the production of sevoflurane in which a chemical called HFIP is mixed with formaldehyde and hydrogen fluoride in the presence of sulphuric acid and heat. This method of production, known as the "one-step process," is covered by two U.S. patents, Patent No. 4,250,334 and 4,469,898 (" the '334 and '898 patents"), assigned to Baxter which expire in 2001 and 2004.

During the 1980's Baxter decided to licence it's rights to market sevoflurane, rather than market it directly. It developed a relationship with Maruishi, a Japanese pharmaceutical company, who commercially developed sevoflurane with great success in Japan. In 1983, Baxter gave Maruishi an option to license, on an exclusive basis, Baxter's sevoflurane patents in Japan, Korea, the Philippines and Taiwan. In 1988, Baxter gave Maruishi a further option to acquire worldwide rights to all of Baxter's then-existing sevoflurane patents.

Abbott Laboratories ("Abbott") and Maruishi then began discussions of a possible arrangement for Abbott to market sevoflurane in places where Maruishi did not do business. Maruishi began negotiations with Abbott and Baxter to develop a new agreement that would enable Maruishi to sell sevoflurane to Abbott for resale around the world. On September 3, 1992, Baxter and Maruishi signed a Patent and Know-How License agreement (hereafter Baxter/Maruishi Agreement).

Clause 2.1 of the Baxter/Maruishi Agreement granted licences in the following terms:

> 2.1 Baxter hereby grants to Maruishi an exclusive license even as to Baxter under the Licensed Patents and any improvements thereon to make, use, have made, sell, and have sold Sevoflurane and HFIP throughout the 'Territory' with rights to sublicense. The 'Territory' shall mean the world, excluding Japan, North and South Korea, and the People's Republic of China exclusive of Hong Kong. 'Sevoflurane and HFIP' shall mean Sevoflurane and HFIP manufactured using a process that but for the license granted therein would infringe one or more of the Licensed Patents.
>
> 2.2 Baxter hereby grants to Maruishi an exclusive license even as to Baxter under the Japanese Patents and any improvements thereon to make Sevoflurane and HFIP in Japan, and to sublicense Central Glass to make Sevoflurane and HFIP in Japan, for sale exclusively to Maruishi for resale by Maruishi in Japan exclusively to Abbott in Japan for resale by Abbott throughout the Territory.

Clause 1.2 defined 'Licensed Patents' as various patents relating to HFIP and/or Sevoflurane listed in Exhibit A to the Baxter/Maruishi Agreement. These included the '334 and '898 Patents, but not the '239 Patent. The '239 patent was previously owned by Ohmeda and recently acquired by Baxter and involves a three-step process to manufacture a generic sevoflurane.

The Baxter/Mariushi Agreement also contained a Know-How License in Clause 2.3:

> 2.3 Baxter hereby grants Maruishi an exclusive license even as to Baxter to use the Know-How and any improvements thereon to make, use, have made, sell and have sold Sevoflurane and HFIP in the Territory, with rights to sublicense, and an exclusive license even as to Baxter with rights to sublicense to Central Glass to use the Know-How and any improvements thereon to make and use Sevoflurane and HFIP in Japan for sale exclusively to Maruishi in Japan and resale by Maruishi exclusively to Abbott in Japan for resale by Abbott throughout the territory.

'Know-How' was defined in Clause 1.1 as follows:

> 1.1 Prior to January 1983, Baxter developed a new inhalant anaesthetic known as 'Sevoflurane' through the Phase 1 clinical trial stage in accordance with the guidelines of the United States Food and Drug Administration ('FDA') and, as a part of such development, acquired confidential proprietary information ('Know-How'). Baxter has supplied Maruishi with all Know-How relating to Sevoflurane and/or HFIP (an immediate form of Sevoflurane), including physico-chemical date, stability profiles, toxicity studies, mutagenicity studies, metabolic and pharmaco-kineric data, and copies of all FDA correspondence, which have been collected by Baxter.

Section 3 of the Baxter/Maruishi Agreement provided for payments for the license granted by Baxter:

> 3.0 Payments
>
> 3.1 for the Section 2 license grant, Maruishi shall make four (4) nonrefundable one time payments to Baxter as follows:
>
> (a) $2.0 million U.S. dollars between December 6 and December 31, 1992,
> (b)$2.0 million U.S. dollars between December 6 and December 31, 1993,
> (c) $2.0 million U.S. dollars between December 6 and December 31, 1994,
> (d) $2.0 million U.S. dollars between December 6 and December 31, 2001.
>
> Maruishi shall determine in its sole discretion the actual date of payment, provided such date shall be within the periods set forth above.
>
> If the Abbott Agreement becomes effective but is then terminated prior to any of the above payment due dates, then any of these Section 3.1 payments due subsequent to termination shall no longer be due to Baxter from Maruishi, except that payment

(a) shall be due even if the Abbott Agreement is terminated prior to December 31, 1992.

3.2 In addition to the Section 3.1 payments, Maruishi shall make royalty payments to Baxter based on the total quantity of Sevoflurane and HFIP sold to Abbott by Maruishi and also based on Abbott's Average Selling Price of Sevoflurane in the Territory. The royalty will be calculated using the following method and factors...

There followed a complicated methodology for determining the royalty payments due pursuant to the Baxter/Maruishi Agreement. The Baxter/Maruishi Agreement contemplated other agreements including but not limited to the following:

(a) Maruishi entered into a Sevoflurane Supply and License Agreement with Abbott dated September 4, 1992 (hereafter *"Maruishi/Abbott Agreement"*);

(b) Maruishi and Central Glass entered into a Licence and Manufacture Agreement dated September 18, 1992 (hereafter the *"Central Glass/Maruishi Agreement"*).

(c) Abbott entered a side letter agreement with Central Glass dated September 18, 1992 (hereafter the *"Abbott/Central Glass Side Latter"*).

In broad terms, the arrangement between these parties was that Central Glass would manufacture sevoflurane and HFIP for exclusive sale to Maruishi for resale exclusively to Abbott. Abbott was thus the party with the ultimate responsibility for the commercial marketing and distribution of sevoflurane in the territory covered by these agreements. For this purpose, the Maruishi/Abbott Agreement contained (clause 14.1) *"an exclusive, non transferable licence in the territory under the Intellectual Property Rights and the Improvements, to sell Sevoflurane...."* The 'Intellectual Property Rights' and the 'Improvements' as detailed in section 1.13 and 1.14 included the *"Licensed Patents and any improvements thereon"* and the *"Know-How and any Improvements thereon"* granted by Baxter to Maruishi by Clause 2 of Baxter/Maruishi Agreement. A dispute Resolution Agreement was entered into on September 4, 1992. Baxter, therefore, was the licensor

of the Licensed Patents, and Abbott the sublicensee with no direct contractual relationship except as signatories to the Dispute Resolution Agreement.

The Dispute Resolution Agreement between Abbott, Baxter, Maruishi and Central Glass contained a detailed provision relating to the resolution of any disputes arising from the Baxter/Maruishi Agreement, the Maruishi/Abbott Agreement, the Central Glass/Maruishi Agreement and the Abbott/Central Glass Side Letter (hereafter singularly as *"Sevoflurane Agreement"* and collectively the *"Sevoflurane Agreements"*).

Article 1 of the Dispute Resolution Agreement provided as follows:

> "1. <u>Purpose of Negotiation, Mediation and Arbitration</u>. It is the intent of the parties in entering into the Agreement that the provisions hereof be applied in such a way as to maintain to the extent reasonable the Commercialization of Sevoflurane and, at the same time, to maintain, to the extent reasonable, taking into consideration the nature of a breach by a party to a Sevoflurane Agreement and the impact thereof on the Original Commercial Relationship. The parties hereby agree that , during the course of any negotiations, mediation or arbitration conducted pursuant to this Agreement or any of the Sevoflurane Agreements, they shall seek to achieve these goals and the parties hereby instruct all negotiators, mediators, any arbitrators under any of the Arbitration Clauses and any CPR Arbitration Panel (as defined below) to conduct such negotiations, mediation or arbitration, with the sole purpose of maintaining to the extent reasonable the Commercialization of Sevoflurane and at the same time returning, to the extent reasonable, taking into consideration the nature of a breach by a party to a Sevoflurane Agreement and the impact thereof on the Original Commercial Relationship, the relationship of the parties in an overall contractual and overall economic sense to the Original Commercial Relationship. Any negotiators, mediators and CPR Arbitration Panels shall resolve disputes submitted to negotiation, mediation or arbitration hereunder by the exercise of sound and impartial business judgment...
>
> An 'Impairment of the Original Commercial relationship' shall mean: (a) an alleged breach or termination of one of the Sevoflurane Agreements that result or could reasonably be expected to result in any change or potential change in the Original Commercial Relationship that would: (i) cause a party to pay more to exercise any of its rights under any of the Sevoflurane Agreement than, but for such change, it would otherwise have been required to pay, including, without limitation, the purchase price such party is required to pay for Sevoflurane and/or HFIP; (ii) prevent a party from exercising any of the rights licensed or sublicensed to it under any of the Sevoflurane Agreements or performing any of its obligations undertaken under any of the Sevoflurane Agreements; (iii) reduce the amount a party would but for such change otherwise receive under any Sevoflurane Agreement; (iv) prevent a party from receiving its full rights or full commercial benefits under any of the Sevoflurane Agreements; (v) prevent or impair the commercialization of Sevoflurane; or (vi)

otherwise impair the Original Commercial Relationship in such a way that it could be
reasonably concluded that any one of the parties would not have entered into the
Sevoflurane Agreements on the original terms and conditions actually set forth in the
Sevoflurane Agreements if such change were in effect at the time of entering into the
Sevoflurane Agreements,....

Abbott obtained FDA approval for sevoflurane in 1995 and it became an immediate success

in the United States, just as it had been in Japan. In 2000 alone, Abbott sold well over $100 million

in sevoflurane in the United States. It's 2000 sevoflurane sales accounted for around 57.7 percent of

the dollar sales of all the inhaled anesthetics sold by all United States' sellers during that year.

In 1998, Baxter acquired the Pharmaceutical Products Division of the Ohmeda health care

business of The BOC Group. Ohmeda was Abbott's principal competitor in the sale of inhaled

anesthetics in the U.S. Ohmeda had developed a method for making sevoflurane that did not

infringe any of the Baxter patents previously assigned. This method of production, known as the

three-step process, is the subject of U.S. Patent No. 5,886,239 (hereafter '239 Patent) dated March

23, 1999. Baxter is now the present owner of the '239 Patent.

Baxter decided to proceed with Ohmeda's plan to introduce a generic sevoflurane in the

United States using the three-step process. Under the Hatch-Waxman Act, Abbott had a period of

data exclusivity during which no one else could obtain FDA approval to sell sevoflurane relying

upon the safety and efficacy data submitted by Abbott. The period ended in 2000, and Baxter filed

an Abbreviated New Drug Application (ANDA). Abbott sued Baxter for patent infringement, based

upon the ANDA filing, in the following two cases, *Abbott Laboratories v. Baxter Pharmaceutical

Products, Inc.,* No. 00-C-5939, and *Abbott Laboratories v. Baxter Pharmaceutical Products, Inc.,*

No. 01-C-1867.

After Abbott learned of Baxter's plans to introduce a generic sevoflurane, Abbott claimed

that if Baxter sold generic sevoflurane before the expiration of the sublicense agreement (December 2005), Baxter would violate the licensing agreement between Baxter and Maruishi, as well as the dispute resolution agreement between Baxter, Abbott, Maruishi, and Central Glass. Pursuant to the Dispute Resolution Agreement, Abbott demanded binding arbitration of its claim on May 25, 2000. The arbitration proceeding was convened in Chicago before a three member panel of arbitrators. The panel consisted of a U.S. attorney, a Spanish attorney, and a Japanese law professor. Neither Maruishi nor Central Glass participated in the proceedings before the arbitrators. The "Final Award" was entered June 15, 2001.

The panel determined that this language with "rights to sublicense" contained in the original Baxter/Maruishi Agreement granted Maruishi all rights to the Licensed Patents, along with rights to any "improvements" on the Licensed Patents. Baxter also granted Maruishi an exclusive license to the Know-How to make and use Sevoflurane and HFIP, with the right to sublicense. Know-How, as defined by the agreement, was tied to the Licensed Patents and the technology disclosed therein. The arbitrators recognized that the Licensed Patents all relate to the "one-step" process for manufacturing Sevoflurane and the three-step process which Baxter sought to market was not an infringement or an improvement on the one-step process. The facts presented at the hearing revealed that Ohmeda developed the three-step process independently from the one-step process through the use of information related to Baxter's expired patents, which were not part of the Licensed Technology in the Baxter/Maruishi agreement. Thus, the three-step process did not use any of the Know-How from the one-step process.

The panel determined that Abbott is a third party beneficiary of the Baxter/Maruishi agreement and, therefore, had a right to sue. Pursuant to the Baxter/Maruishi agreement, Abbott has the express

7

right to invoke the Dispute Resolution Agreement if it "reasonably believes that a dispute threatens to result in an Impairment of the Original Commercial Relationship." Any dispute of the sevoflurane Agreements that could result in the Impairment of the Original Relationship is all that the Dispute Resolution Agreement requires. The tribunal found that the Dispute Resolution Agreement created an independent obligation to prevent impairment of the Original Commercial Relationship which would result in a breach of the Parties' obligations. Baxter admitted that should they re-enter the market with a generic sevoflurane, Abbott's sales of sevoflurane would be affected adversely, affecting the overall economic benefit for Abbott, Maruishi, and Central Glass. Therefore Baxter's sales of a generic sevoflurane would constitute an Impairment of the Original Commercial Relationship. As defined by clause (a)(iii), generic sales will "reduce the amount a party would but for such change otherwise receive under any Sevoflurane Agreement," constituting an impairment. The tribunal determined that on this basis, Baxter should be enjoined from selling a generic sevoflurane product through the term of the Baxter/Maruishi Agreement, which expires in June 2005, as to maintain the Original Commercial Relationship.

The arbitrators further found that the obligation of good faith under Illinois law establishes an independent cause of action under the Baxter/Maruishi Agreement. Although the Agreements are silent as to the issue of competition by Baxter, the arbitrators concluded it would be a breach of the duty of good faith for Baxter to "deprive its own sublicensee of the fruits of its contract." Baxter's proposal to enter into the sevoflurane market will not only "hurt Abbott, but will also reduce Baxter's only royalties from Abbott's sales."

Baxter argued that any agreement between Baxter and Abbott that prevented Baxter from entering into the sevoflurane market would have anticompetitive implications and, therefore, would be

8

illegal under United States antitrust law. The tribunal found that competitive implications were

foreseeable by the Parties in 1992 when generic competition was expected after December 2000. The

tribunal determined that Baxter had not established that competition is not still possible. It was

Baxter's acquisition of Ohmeda and the '239 Patent, not the Sevoflurane Agreements, which removed

Ohmeda from the sevoflurane market as an independent generic competitor with Abbott. Baxter has

moved for summary judgment to vacate the arbitration award dated June 15, 2001.

## JURISDICTION

This action arises under the federal antitrust laws, as well as under the Federal Arbitration Act

and Chapter 2 thereof, 9 U.S.C. §§ 201-208, which implements the Convention of the Recognition and

Enforcement of Foreign Arbitral Awards. This Court has subject matter jurisdiction pursuant to 28

U.S.C. § 1331, 9 U.S.C. §203, and 15 U.S.C. §26. Venue is proper in this district based upon 28

U.S.C. §1391(b), 9 U.S.C. § 204, and 15 U.S.C. §22.

## STANDARD OF REVIEW

Under the Convention, the district court's role in reviewing an arbitral award is strictly limited:

"The court shall confirm the award unless it finds one of the grounds for refusal or deferral of

recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. The

grounds for refusing to recognize or enforce an arbitral award are set forth in section V of the

Convention. Art. V(1)(2). The only ground relevant for purposes of the parties cross motions for

summary judgment is if "cognition or enforcement of the award would be contrary to the public

policy" of the country in which enforcement or recognition is sought. Convention Art V(2). Although

the Seventh Circuit has stated that the Convention "contemplates the possibility of the award being set

aside in a proceeding under local law *Lander Co. v. MMP Invs., Inc.,* 107 F. 3d 476, 481 (7th Cir. 1997), *cert. denied,* 522 U.S. 811, 118 S. Ct. 55, 139 L. Ed. 2d 19 (1997) thus we entertain Baxter's last two argunments. "Judicial review of an arbitration award is extremely limited." *E.I. DuPont de Nemours v. Grasselli Employees Independent Ass'n,* 790 F. 2d 611, 614 (7th Cir.) *cert. denied* —U.S. —, 107 S. Ct. 186, 92 L. Ed. 2d 120 (1986). Baxter seeks vacation of the award pursuant to the contrary to public policy ground set forth in Art. V(2). We review Baxter's arguments keeping in mind that the arbitrators' findings are entitled to great deference by the court.

## DISCUSSION

In support of its motion to vacate the arbitration award Baxter raises three substantive arguments.[1] First, Baxter contends that the arbitrators interpretation of the sevoflurane contracts and the resulting award in Abbott's favor creates an illegal "market allocation" agreement in violation of section 1 of the Sherman Act. Next, Baxter contends that the award requires Abbott to violate a FTC consent decree. Finally, Baxter argues the award contravenes Illinois public policy against enforcing unwritten covenants not to compete. Baxter admits that it presented these same arguments during the arbitration hearing.

### I. Market Allocation In Violation of the Sherman Act.

Baxter argues that the tribunal's interpretation of the Sevoflurane Agreements is a market allocation agreement and thus is a *per se* violation of section 1 of the Sherman Act. Baxter claims that

---

[1] In Baxter's motion to vacate Baxter also objects to the foreign arbitrators. We agree with Abbott that Baxter's argument as to the foreign arbitrators is untimely and thus constitutes a waiver precluding judicial review. *Health Serv. Mgmt. Corp. v. Hughes,* 975 F. 2d 1253, 1263-64 (7th Cir. 1992). Furthermore, the composition of the panel was dictated by the parties agreement.

the market allocation agreement here-if enforced-will eliminate domestic competition in the sale of sevoflurane in the short run and delay the onset of generic competition through a comprehensive allocation of the Untied States market for the sale of sevoflurane. The agreement allegedly will cost U.S. sevoflurane purchasers between $200 and $300 million as a result of the higher prices that Abbott will be able to charge in the absence of competition.

In support of this argument Baxter offers two affidavits, of its employees Ronald Quadrel and Raul A. Trillo, Jr. These affidavits were not submitted to the arbitrators. We find that Baxter's tardy submission of these affidavits is improper and strike these affidavits with prejudice. Baxter offers no justification for its failure to present this evidence by way of testimony during the arbitration hearing.

Under §1 of the Sherman Act, 15 U.S.C. § 1, "[e]very contract, combination..., or conspiracy, in restraint of trade" is illegal. "Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' [the Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 7, 118 S. Ct. 275, 139 L. Ed. 2d 199 (1977). There are two separate types of section 1 violations. If the rule of reason applies, plaintiff must prove that defendants' actions resulted in an unreasonable restraint of trade. Alternatively, plaintiff must prove that defendants' conduct falls within one of several categories that are conclusively presumed to be illegal *per se* violations of section 1. If plaintiff proves that defendants' conduct falls within one of these categories, it is not necessary to prove that the conduct resulted in an unreasonable restraint on trade. *See Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 343-48, 102 S. Ct. 2466, 2472-75, 73 L. Ed. 2d 48 (1982).

When analyzing a motion for summary judgment on a section1 claim, the Supreme Court has held that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1

case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). For section 1 claims the nonmovant must submit more than ambiguous evidence of the alleged conspiracy to withstand a motion for summary judgment. "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

Baxter, deferring to the findings of the two foreign arbitrators, claims that the Baxter/Maruishi Agreement contains "an implied market allocation" and the arbitration award forbids Baxter from selling sevoflurane in competition with Abbott until December 10, 2005. A review of the award offers little support for Baxter's *per se* violation theory.

A *market* allocation agreement is an "agreement between competitors at the same level of market structure to allocate territories in order to minimize competition[.]" *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972). *Per se* rules apply only to agreements which "always or almost always tend to restrict competition." *Broadcast Music, Inc. v. Columbia Broad. Systems, Inc.,* 441 U.S. 1, 19-20, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979). However, the Supreme Court has been reluctant to "extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458-59, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986).

The tribunal accepted Abbott's argument on this issue. The arbitrators specifically found the following:

> Baxter's evidence assumed that the Sevoflurane Agreements obligated Baxter to license
> the three-step process to Abbott, whereas this Tribunal considers that the three-step
> process is not included in the license granted to Maruishi and sublicensed to Abbott

under the Sevoflurane Agreements (see §§ 19-22 above). This is not a case of the Sevoflurane Agreements having any competitive implications that were not foreseeable by the Parties in 1992 when generic competition was expected after December 2000, and Baxter has not established that such competition is not still possible. The apparent antitrust issues relating to the Sevoflurane market that Baxter now seeks to rely upon to escape its contractual obligations under the Sevoflurane Agreements do not arise from those Agreements themselves, but as a result of Baxter's acquisition of Ohmeda and the 239 Patent, which removed from the Sevoflurane market the very type of independent generic competitor foreseen by the Parties in 1992.

Pages 18-19 ¶¶ 34-35.

We agree with the arbitrators on this very important point. In addition, as Abbott asserts, the present arrangement is such that the "competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," known as the rule of reason analysis. *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978). The contractual arrangement with Abbott and Baxter and Baxter's subsequent acquisition of Ohmeda creates a unique situation in light of the terms of the original commercial relationship language in the agreements. Furthermore, the injury now alleged by Baxter is not your typical type of antitrust injury. Here, Baxter who profits tremendously from its contractual arrangement with Abbott, wants to increase its profits by introducing generic sevoflurane, thus establishing its presence in the generic submarket as well as the existing sevoflurane market which Baxter currently profits from.

Baxter fails to cite to any case law where the *per se* analysis has been applied to void a licensing agreement thereby allowing a licensor to compete with its sublicensee in the product market that is the subject of the license agreement. Rather, Baxter cites to *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608 92, S. Ct. 1126, 31 L.Ed. 2d 515 (1972) in which the Supreme Court found an

13

agreement between an association of independent grocers to be a geographical market allocation and thus a per se Sherman Act violation. 405 U.S. at 600. Moreover, there is no evidence in the record as to the parties intent to divide the market or minimize competition. We find the present arrangement differs from *Topco* in that Baxter has not alleged that the agreements are "naked restraints on trade with no purpose except stifling of competition." *Id.* at 608 (quoting *White Motor Co. v. United States,* 372 U.S. 253, 263 83 S. Ct. 696, 9 L. Ed. 2d 738 (1963)). The record is silent with respect to Abbott's harm to generic competition. Baxter has also failed to allege that another generic producer could not compete with Abbott in the sale of sevoflurane. In fact, Ohmeda was free to compete with Abbott in the sevoflurane market prior to its acquisition by Baxter. Thus, the only adverse impact on competition was due to the actions of Baxter and not the tribunal's interpretation of the Sevoflurane Agreements.

Baxter also cites *to Blackburn v. Sweeney,* in which the Seventh Circuit held that an agreement between two former law partners to allocate advertising to specific territories in Indiana was an agreement to allocate markets and thus the *per se* rule should apply. 53 F.3d 825, 827 (7th Cir. 1995). In *Blackburn,* the court determined that the agreement not to compete "was not a necessary condition for the increased competition resulting from the split-up of the partnership: ...the partnership was essentially over at the time the Agreement was entered." *Id.* at 828. In fact, the evidence presented to the arbitrators reveals that during the 1980's Baxter decided to license the rights to market sevoflurane, rather than market it directly. There were no facts presented to the arbitrators to support any type of market allocation. Rather, Baxter decided not to manufacture and market sevoflurane because it did not have the capacity to do so. Anyone else in the position to sell a generic sevoflurane will be able to do so once this other competitor's ANDA is approved by the FDA. Furthermore, the agreement

granting Abbott a sublicense of the Baxter technology will expire in December 2005, and Baxter will then be free to compete.

In the alternative, Baxter argues that, even if, the arbitrators' decision prohibiting Baxter from selling generic sevoflurane is not concluded to be an illegal market allocation under the Sherman Act it must be viewed as an "ancillary covenant not to compete." Relying on *Compton v. Metal Prods., Inc.*, 453 F.2d 38 (4th Cir. 1971), Baxter contends that an ancillary covenant not to compete is also an unreasonable restraint on trade under the antitrust laws. We again find the law relied on by Baxter to be factually distinct from the case at bar. Paragraph 15 of the license agreement in *Compton* stated that Compton would not "engage in any business or activity relating to the manufacture or sale of equipment of the type licensed hereunder...." *Compton,* 453 F.2d at 44. Thus, the licensor agreed not to sell any coal mining screw conveyors, whether or not covered by the patent. The court in *Compton,* stated that Paragraph 15 did not appear to be an ancillary agreement, given that the licensor agreed to remove itself completely from the mining machine manufacturing business. *Id.* at 45. Obviously, the *Compton* agreement is much broader than the sevoflurane agreements, in which Baxter is free to sell other inhaled anesthetics, and in fact admits to the sale of the competing products desflurane and isoflurane.

Baxter relying on *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46 111 S. Ct. 401, 112 L. Ed. 2d 349 (1990) also argues that the arbitrators limited the restriction to the United States rather than splitting up the market between Abbott and Baxter. In *Palmer,* the Supreme Court held that an agreement between two bar review course providers, who agreed not to compete against each other, assigning one provider to the entirety of Georgia, was *per se* unlawful. *Id.* at 47. The *Palmer* court concluded that the agreement between the parties was a naked restraint because it was formed for the

15

purpose of raising the price of the product in question. *Id.* at 47-49. Here, there is no allegation that the agreement between Abbott and Baxter was created to raise the price of sevoflurane. In fact, Baxter was never a competitor with Abbott in the sevoflurane market, whereas in *Palmer,* the two parties were actual *competitors* that agreed to not compete. *See Palmer,* 498 U.S. 46. The arbitrators were presented with the undisputed facts that Baxter exclusively licensed its ability to commercialize the licensed patents in the United States to Abbott; the licensing agreements created a new competitor to existing inhaled aesthetics, whereas the competitor in *BRG* was plainly eliminated due to their agreement. And once again, competition in the sevoflurane market is still possible not just from Baxter.

Moreover, to satisfy as a reasonable ancillary restraint, an agreement must be "ancillary to the main business purpose of a lawful contract" and "necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests." *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 265 (7th Cir. 1981). Baxter contends that the agreements are not "ancillary" to the "main business purpose." However the two cases Baxter cites for this contention, *Palmer* and *Compton*, contain agreements which are distinguishable from the sevoflurane agreements in this case. In *Palmer,* the agreement was entered into for the purpose of raising prices in the specified market. *See Palmer,*498 U.S. at 47. There is no such agreement here. In *Compton,* the agreement in effect removed Compton from the mining machine business entirely, which is not the case here, as Baxter is free to sell other inhaled anesthetics and admits to doing so. *See Compton,* 453 F.2d at 45. As the arbitral panel found, Abbott has never argued or attempted to preclude generic competition generally in sevoflurane; the only competitor that Abbott has sought to prohibit for selling a generic sevoflurane is its own exclusive licensor, Baxter.

16

(R.237). In fact, as the arbitrators concluded, if Baxter had not acquired the Ohmeda assets, then Ohmeda may have been competing with Abbott in the sale of sevoflurane today. *Id.* Moreover, the arbitration does not affect Baxter's right to sell its desflurane and isoflurane products in competition with Abbott's sevoflurane or the sales or other anesthetic products by other competitors. Baxter has not established that generic competition is not still possible.

Baxter also contends that the Agreements are too broad, extending to any sevoflurane product and not just the patented technology, thereby not satisfying the second requirement. However, Baxter fails to recognize that this court must ask "whether an agreement promoted enterprise and productivity at the time it was adopted." *See Polk Bros. v. Forest City Enterprises,* 776 F.2d 185, 189 (7th Cir. 1985). Here, Baxter admits that the agreements promoted the enterprise because Abbott sold over $100 million in sevoflurane in the U.S. in 2000, accounting for 57.7 percent of the dollar sales of all the inhaled anesthetics sold by all U.S. sellers during that year. It is also evident that Abbott expended a significant amount of money, approximately $1.4 billion, into the commercial development of sevoflurane. These property interests must be protected and Baxter admits that its entry into the market would reduce Abbott's profits as well as Baxter's royalties. The arbitrators rejected this precise argument on the very logical ground that the antitrust issues raised by Baxter "do not arise from those [Sevoflurane] Agreements themselves, but as a result of Baxter's acquisition of Ohmeda and the 239 Patent, which removed from the sevoflurane market the very type of independent generic competitor foreseen by the Parties in 199." (R. 3267). Finally, there is no evidence in the record that Abbott sought to harm generic competition whatsoever. As Abbott points out the only circumstance in which the award could even conceivably could affect competition is if Baxter retains control of the Ohmeda three-step process and does not transfer this process to another manufacturer.

The evidence presented to the arbitrators fails to state a section 1 claim under a rule of reasons analysis. The rule of reason analysis is applicable to "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business involved, the particular restraint's history, and the reasons it was imposed." *Wilk v. American Med. Ass'n*, 895 F.2d 352, 358 (7th Cir. 1990). The United States Department of Justice and Federal Trade Commission Antitrust Guidelines for the Licensing of Intellectual Property (1995) ("Intellectual Property Guidelines") recognize that in general, "restraints in intellectual property licensing arrangements are evaluated under the rule of reason." Intellectual Property Guidelines, § 3.4. In applying the rule of reason, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977). Baxter argues that even if the rule of reason analysis is applied that the agreements would still be unlawful because of its anticompetitive effects, relying on the current market share of sevoflurane to show the anticompetitive effects of the agreement. However, as Abbott points out, these effects should be judged at the time the contract was entered into, not after its objectives have been accomplished. *See Polk Bros.*, 776 F.2d at 189. In this case, at the time the agreements were entered into, sevoflurane was not even on the market. Therefore, the licensing arrangement was pro-competitive, in that it promoted Abbott's investment to introduce the product into the United States and Baxter cannot artificially create antitrust claims by narrowly defining the relevant market to be only Abbott and Baxter. In addition, any anticompetitive consequence is a product of the parties agreements. Other competitors are free to enter the market.

## 2. The Award Does Not Require Abbott to violate a FTC Consent Decree

Baxter's second argument alleges that the final award requires Abbott to violate a FTC Consent Decree. This court agrees with Abbott that Baxter does not have standing to enforce the FTC Decree. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S. Ct. 1917, 44 L. Ed.2d 539 (1975), the Supreme Court reiterated the well-settled rule that " a consent decrees is not enforceable directly or in collateral proceedings by those who are not parties to it, even though they were intended to be benefitted by it." *Id.* at 750, 95 S. Ct. 1917. "Cases involving antitrust consent decrees have hewed closely to the *Blue Chip* rule barring any person not directly participating in the consent decree from suing to enforce its terms." *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.,* 654 F. Supp 1419, 1437 (D. De. 1987), *aff'd,* 988 F. 2d 386 (3rd Cir.), *cert. denied,* 510 U.S. 908, 114 S. Ct. 289, 126 L. Ed2d 239 (1993). Indeed, Baxter has not cited a single case in which a nonparty to a government antitrust consent decree was permitted to enforce the decree.

Moreover, Baxter contends that the Award causes Abbott to violate paragraphs III and II(B) of the consent decree. Paragraph III provides in part that where Abbott is a party to an infringement action in which it is the New Drug Application ("NDA") holder, it cannot be a party to an agreement with the alleged infringer by which the parties agree not to dismiss the litigation, the NDA holder provides compensation to the alleged infringer and the alleged infringer agrees to refrain from selling a drug containing the product at issue. This provision does not apply, however, because at the time of the Sevoflurane Agreements, Baxter was the owner of the patents and not the alleged infringer. Secondly, there was no pending litigation between Abbott and Baxter relating to sevoflurane at the time of the Agreements. There has also been no agreement to not dismiss the litigation, nor has there been an agreement that Baxter would be paid to not sell a product until the litigation was resolved. Thus paragraph III does not apply.

Paragraph II(B) provides that Abbott may not be a party to an agreement in which it is an NDA

holder and another party is the Abbreviated New Drug Application ("ANDA") first filer, pursuant to

which the ANDA first filer agrees to refrain from researching, developing, manufacturing, marketing

or selling a drug product that is not the subject of a patent infringement action. This paragraph also

does not apply to the Sevoflurane Agreements given that the Agreements were not made between an

NDA holder and an ANDA first filer. Baxter was the patent owner and had not filed an ANDA for

sevoflurane. The fact that Baxter is now an ANDA filer is only a consequence of its acquisition of

Ohmeda as the panel recognized. Baxter's actions cannot change the terms of the Agreement. Thus

paragraph II(B) is also inapplicable. For all these reasons, this court finds that Baxter does not have

standing to enforce the FTC Decree.

### 3. The Arbitration Award does not Contravene Illinois' public policy.

Baxter's final argument contends that the Arbitration Award creates an implied covenant not to

compete, which is contrary to Illinois public policy. While a court is reluctant to do so, it may vacate

an award for violating a public policy that is "explicit," "well-defined," and "dominant" as

"ascertained by reference to the laws and legal precedents and not from general considerations of

proposed public interest." *United Paperworkers Int'l Union v. Misco, Inc.* 484 U.S. 29, 42, 108 S. Ct.

364, 98 L. Ed2d 286 (1987). Baxter cites 740 ILCS 10/3 (2001), which states that agreements

between a person and "any other person who is, or but for a prior agreement would be a competitor"

which act to divide "customers, territories, supplies, sales, or markets, functional or geographical, for

any commodity or service," are forbidden. However, this statute does not specifically address implied

covenants not to compete, but rather is a general antitrust statute. "[R]estrictive covenants in

employment contracts are looked at with more scrutiny than such covenants that are ancillary to the

sale of a business...." *Eichmann v. Natn'l Hosp. and Health Care Servs., Inc.,* 308 Ill.App.3d 337, 342

(1st Dist. 1999). According to Abbott's submissions no Illinois statute prohibits implied covenants not

to compete. In the present case, the implied covenant not to compete is coterminous with the existing

licensing agreement and Abbott does not seek protection after the expiration of the license agreements

on December 10, 2005. "In order for a noncompetition agreement to be valid, [ ] it must be ancillary

to a valid transaction, such that the covenant not to compete is subordinate to the main purpose of the

transaction." *Liautaud v. Liautaud,* 221 F.3d 981, 986 (7th Cir. 2000). Thus, the "covenant" is

ancillary to the valid Sevoflurane Agreements, which were established for the main purpose of

commercially developing sevoflurane.

Baxter further argues that the covenant is not reasonable and Illinois courts have refused to

"modify a restrictive covenant" to make it reasonable where modifying the covenant "would be

tantamount to fashioning a new agreement." *See Eichmann,* 308 Ill.App.3d at 347. However, in this

case, the scope of the covenant not to compete is also reasonable by definition. The reasonableness of

the restraint depends on the "time and territory as judged by the circumstances of the particular case."

*Sheehy v. Sheehy,* 299 Ill.App.3d 996, 1004 (2nd Dist. 1998). Here, the scope is no greater than that of

the Sevoflurane Agreements and is, therefore, reasonable. After reviewing the record it can only be

concluded that the arbitrators obviously considered and rejected the defenses now urged by Baxter as

grounds to vacate the Award.

## CONCLUSION

For the foregoing reasons Abbott's motion to confirm the Arbitration Award is hereby granted. Baxter's motion to vacate is denied with prejudice. Both cases are hereby terminated and all other pending motions terminated as moot. This is a final and appealable order.

So Ordered.                                             Entered: 3/26/02

                                                        Ronald A. Guzman
                                                        United States Judge